# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                                                   **Case No. 17-CR-16**

**ORVIN KAY**
    **Defendant.**

## DECISION AND ORDER

The government charged defendant Orvin Kay with distribution of Oxycodone. Defendant moved to suppress evidence obtained from a pole camera. The magistrate judge handling pre-trial proceedings recommended that the motion be denied. Defendant objects. My review is de novo. Fed. R. Crim. P. 59(b).

**I.**

The facts set forth in the magistrate judge's recommendation, which I adopt, are undisputed. As part of their investigation into defendant's alleged drug trafficking activities, agents installed a hidden camera on a utility pole located on a neighbor's property, which they used to monitor defendant's driveway and front yard for 87 days. Agents did not obtain a warrant to install the pole camera. Agents had the ability to zoom and pan the camera, but they rarely did so. Rather, the camera primarily captured defendant's driveway and front yard; his residence was barely visible. The camera did not have infrared capabilities.

Based in part on the information obtained from the pole camera, agents obtained a warrant to search defendant's residence and a criminal complaint and warrant for his arrest. On execution of the search warrant, agents recovered distribution quantities of Oxycodone, and

following his arrest defendant made incriminating statements.

**II.**

Defendant moves to suppress all evidence – direct and derivative – obtained from the pole camera. He argues that use of the camera to continuously surveil his residence constituted a search, for which agents needed a warrant. He analogizes use of the camera to installation of a GPS tracking device, United States v. Jones, 565 U.S. 400 (2012), or the collection of cell-site location information ("CSLI"), Carpenter v. United States, 138 S. Ct. 2206 (2018), which the Supreme Court has held does constitute a search under the Fourth Amendment. See also Katz v. United States, 389 U.S. 347, 351 (1967).

As the magistrate judge noted, nearly every federal court which has addressed the issue has held that pole camera surveillance of a person's driveway or the exterior of his residence does not violate the person's reasonable expectation of privacy. (R. 149 at 6-7.) As these courts have explained, a person does not have a reasonable expectation of privacy in what he knowingly exposes to the public, even at his own home. California v. Greenwood, 486 U.S. 35, 41 (1988); see, e.g., United States v. Evans, 27 F.3d 1219, 1228-29 (7th Cir. 1994) (collecting cases finding no legitimate expectation of privacy in driveways and porches visible from a public street); see also California v. Ciraolo, 476 U.S. 207, 213 (1986) ("That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). Further, the Supreme Court has held that police may use technology to substitute for surveillance they could lawfully conduct themselves. See, e.g., United States v. Knotts, 460 U.S. 276, 282 (1983) ("Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with

such enhancement as science and technology afforded them in this case."). There is accordingly no impediment, courts have concluded, to the police using a camera to make the same kinds of observations as could an officer standing on a public street.[1]

Defendant argues that citizens have a reasonable expectation that their homes will not be subject to continuous, long-term video monitoring by law enforcement. He notes Carpenter's admonition against "a too permeating police surveillance," 138 S. Ct. at 2214; the Court's recognition that use of advanced technology to facilitate long-term monitoring may distinguish cases like Knotts, which involved a beeper monitoring a single trip, id. at 2215; and the Court's statement that a "person does not surrender all Fourth Amendment protection by venturing into the public sphere." Id. at 2217 (citing Katz, 389 U.S. at 351-52).

Carpenter was a limited decision, as the Court itself stressed. Id. at 2220. The Court noted that it was confronting "a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals." Id. at 2216. The Court stressed that the technology at issue there permitted law enforcement to track the whole of a person's physical movements, secretly and with little cost and effort. Id. at 2217.

> Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. These location records hold for many Americans the privacies of life. And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense.

---

[1] Defendant makes no claim that the agents trespassed on his property when they installed the camera. Nor does he claim that the camera recorded events inside his home or otherwise hidden from public view.

3

Id. at 2217-18 (internal citations and quote marks omitted). The Court further noted that "[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." Id. at 2218. Finally, the Court noted:

> [T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which currently maintain records for up to five years. Critically, because location information is continually logged for all of the 400 million devices in the United States – not just those belonging to persons who might happen to come under investigation – this newfound tracking capacity runs against everyone. Unlike with the GPS device in Jones, police need not even know in advance whether they want to follow a particular individual, or when.
>
> Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may – in the Government's view – call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the few without cell phones could escape this tireless and absolute surveillance.

Id. After explaining why cell-site data raised these particular privacy concerns, which distinguished prior cases like Knotts, the Court concluded: "Our decision today is a narrow one. . . . We do not . . . call into question conventional surveillance techniques and tools, such as security cameras." Id. at 2220.

Unlike the new technology addressed in Carpenter, "the surveillance here used ordinary video cameras that have been around for decades." United States v. Tuggle, No. 16-cr-20070, 2018 U.S. Dist. LEXIS 127333, at *9 (C.D. Ill. July 31, 2018). Defendant stresses that pole cameras allow constant surveillance over an extended period of time, something agents likely could not accomplish physically. It is true that Carpenter distinguished the short-term public

4

tracking approved in previous cases from the long-term surveillance of a person's every move allowed by new technologies like GPS or CSLI. However, "[p]ole cameras are limited to a fixed location and capture only activities in camera view, as opposed to GPS, which can track an individual's movement anywhere in the world." Id. at *10. Pole camera surveillance is thus unlikely to provide the same "intimate window" into the person's life, revealing his "political, professional, religious, and sexual associations." Carpenter, 138 S. Ct. at 2217 (internal quote marks omitted); see United States v. Houston, 813 F.3d 282, 290 (6th Cir. 2016).[2] I accordingly see no basis for revising my previous view that pole camera surveillance of the sort conducted here does not constitute a Fourth Amendment search. See United States v. Tirado, No. 16-CR-168, 2018 U.S. Dist. LEXIS 64379, at *10-12 (E.D. Wis. Apr. 16, 2018); United States v. Aguilera, No. 06-CR-336, 2008 U.S. Dist. LEXIS 10103, at *3-5 (E.D. Wis. Feb. 11, 2008).[3] Given this conclusion, I need not address the government's good faith and inevitable discovery arguments.

---

[2] Defendant appears to overstate the nature of the surveillance in this case when he contends that the camera captured "the aggregate of all activities associated with the curtilage of his house over 87 days." (R. 168 at 10.) As the magistrate judge noted, the camera primarily captured defendant's driveway; agents used it to corroborate cell phone records that placed known suspects at the residence, but given the placement and limitations of the camera they were unable to read the license plates of vehicles parked in defendant's driveway. (R. 149 at 2-3.) There is no indication that the camera recorded all activities occurring within the curtilage of defendant's home. In reply, defendant contends that resolution of his motion should not turn on the quality of the results of the surveillance. (R. 170 at 2.) However, the scope of the surveillance permitted by the camera is surely relevant to the Fourth Amendment analysis.

[3] Defendant also relies on United States v. Vargas, No. 13-cr-6025, 2014 U.S. Dist. LEXIS 184672 (E.D. Wash. Dec. 15, 2014), but that decision is distinguishable on its facts. The Vargas court stressed that the camera in that case recorded the activities in the defendant's partially fenced, rural front yard; "this is not a public or urban setting." Id. at *34. The camera in this case recorded activities in an urban area in the City of Milwaukee.

5

**III.**

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 149) is adopted, and defendant's motion to suppress (R. 113) is denied.

Dated at Milwaukee, Wisconsin, this 21st day of August, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge